# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE TESLA MOTORS, INC. | : | **Consolidated** |
| STOCKHOLDER LITIGATION | : | **C.A. No. 12711-VCS** |

## MEMORANDUM OPINION

Date Submitted: December 21, 2017
Date Decided: March 28, 2018

Jay W. Eisenhofer, Esquire and James J. Sabella, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware; Michael Hanrahan, Esquire, Paul A. Fioravanti, Jr., Esquire and Samuel L. Closic, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Ned Weinberger, Esquire, Ryan T. Keating, Esquire and Thomas Curry, Esquire of Labaton Sucharow LLP, Wilmington, Delaware; Joel Friedlander, Esquire and Jeffrey M. Gorris, Esquire of Friedlander & Gorris, P.A., Wilmington, Delaware; Justin S. Brooks, Esquire of Guttman, Buschner & Brooks PLLC, Wilmington, Delaware; Randall J. Baron, Esquire, David T. Wissbroecker, Esquire and Maxwell R. Huffman, Esquire of Robbins Geller Rudman & Dowd LLP, San Diego, California; Lee D. Rudy, Esquire, Eric L. Zagar, Esquire, Robin Winchester, Esquire and Kristen L. Ross, Esquire of Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania; and Mark Lebovitch, Esquire and Jeroen van Kwawegen, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York, New York, Attorneys for Plaintiffs.

David E. Ross, Esquire, Garrett B. Moritz, Esquire and Benjamin Z. Grossberg, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and William Savitt, Esquire, Graham W. Meli, Esquire, Steven Winter, Esquire and David E. Kirk, Esquire of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

The question addressed in this Memorandum Opinion is whether Plaintiffs have adequately pled that Elon Musk is a controlling stockholder of Tesla, Inc. ("Tesla" or the "Company"). Tesla acquired SolarCity Corporation ("SolarCity") in 2016 (the "Acquisition"). Following the announcement of the proposed transaction, Tesla stockholders filed several derivative and putative class action lawsuits in this Court alleging that the Tesla board of directors (the "Board") and Musk as a conflicted controller breached their fiduciary duties by approving the Acquisition for the benefit of SolarCity stakeholders and to the detriment of Tesla stockholders.

While it was not required to do so under Delaware law, the Board submitted the Acquisition to Tesla stockholders for approval. A majority voted in favor of the transaction. Following the stockholder vote, Defendants moved to dismiss the now-consolidated complaint under *Corwin v. KKR Financial Holdings LLC* ("*Corwin*").[1] Plaintiffs oppose the motion, in part, on the ground that *Corwin* does not apply because the Acquisition involved a conflicted controlling stockholder (Musk).[2] Musk, Tesla's Chairman and Chief Executive Officer, owns less than a majority of

---

[1] 125 A.3d 304 (Del. 2015) (holding that director approval of a transaction not subject to entire fairness review is entitled to pleading stage business judgment deference when the transaction is later approved by an uncoerced, fully informed majority vote of disinterested stockholders).

[2] *In re Merge Healthcare, Inc.*, 2017 WL 395981, at *6–7 (Del. Ch. Jan. 30, 2017) (holding that a well-pled complaint supporting a reasonable inference that the transaction either involved a conflicted controller will defeat a *Corwin* defense at the pleading stage).

1

Tesla's outstanding voting stock. According to Defendants, Plaintiffs have failed to plead facts that would support a reasonable inference that Musk, as a minority blockholder, exercised either control over Tesla generally or control over Tesla's Board during its consideration and approval of the Acquisition. After carefully reviewing the operative complaint, in a close call, I conclude it is reasonably conceivable that Musk, as a controlling stockholder, controlled the Tesla Board in connection with the Acquisition. Accordingly, for the reasons set forth below, Defendants' motion to dismiss must be denied.

## I. FACTUAL BACKGROUND

I have drawn the facts from well-pled allegations in the Second Amended Verified Class Action and Derivative Complaint (the "Complaint")[3] and documents incorporated by reference or integral to the Complaint.[4] Tesla produced documents to Plaintiffs pursuant to 8 *Del. C.* § 220 ("Section 220 Documents").[5] The parties have agreed that all Section 220 Documents shall be deemed incorporated within the

---

[3] Citations to the Complaint are to "Compl. ¶ __."

[4] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[5] Compl. ¶ 8.

2

Complaint whether or not expressly referenced or incorporated therein.[6] The following facts, as well-pled in the Complaint, are accepted as true for purposes of the present motion.[7]

**A. The Parties and Relevant Non-Parties**

Plaintiffs are Tesla stockholders and were so at all relevant times.[8] They bring both direct claims on behalf of themselves and a putative class of injured Tesla stockholders as well as derivative claims on behalf of the Company.

Nominal Defendant Tesla is a public Delaware corporation headquartered in Palo Alto, California that designs, develops, manufactures and sells electric vehicles and energy storage products.[9] Tesla's Board comprises seven members: Elon Musk ("Musk"), Brad W. Buss, Robyn M. Denholm, Ira Ehrenpreis, Antonio J. Gracias, Stephen T. Jurvetson and Kimbal Musk ("Kimbal").[10]

Non-party SolarCity was a public Delaware corporation headquartered in San Mateo, California that was founded by Musk and his cousins, Peter and Lyndon Rive

---

[6] Compl. 1; Defs.' Opening Br. in Supp. of Mot. to Dismiss the Second Am. Compl. (hereinafter "Defs.' Opening Br.") 4 n.2; Transmittal Aff. of Garrett B. Moritz in Supp. of Defs.' Mot. to Dismiss the Second Am. Compl. (hereinafter "Moritz Aff."), Ex. 7 ¶ 8.

[7] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[8] Compl. ¶¶ 11–18.

[9] Compl. ¶ 2.

[10] Compl. ¶ 7. I refer to Kimbal Musk by his first name to avoid confusion with Elon Musk. I intend no disrespect.

("Peter" and "Lyndon").[11] It principally operated as a solar energy system installer.[12] Its board of directors (the "SolarCity Board") included Musk, Gracias, Lyndon, Peter, Nancy Pfund, and John H.N. Fisher.[13] Lyndon served as SolarCity's CEO and Peter as its Chief Technology Officer ("CTO").[14]

Defendant Musk is Tesla's largest stockholder.[15] At the time of the Acquisition, Musk owned approximately 22.1% of Tesla's common stock.[16] He serves as Chairman of the Tesla Board (since April 2004) and as Tesla's CEO (since October 2008) and Chief Product Architect.[17] He also led Tesla's pre-initial public offering ("IPO") funding rounds.[18] Tesla has acknowledged in its Securities and Exchange Commission filings that Musk is not an independent director.[19]

---

[11] Compl. ¶¶ 3, 64. I refer to both Peter and Lyndon Rive by their first names to avoid confusion. Again, no disrespect is intended.

[12] *See* Compl. ¶¶ 3, 65.

[13] Compl. ¶¶ 35, 49, 64. Except for Musk and Gracias, none of the SolarCity Board members are party to this litigation.

[14] Compl. ¶ 64.

[15] Compl. ¶ 20.

[16] *Id.*

[17] Compl. ¶¶ 20, 271.

[18] Compl. ¶ 2.

[19] Compl. ¶ 20.

As Tesla's Chief Product Architect, Musk plays a key role in the design of all Tesla products.[20] He also contributes "significantly and actively" to Tesla by "recruiting executives and engineers, [] raising capital for [the Company] and bringing investors to and raising public awareness of the Company."[21] In its SEC filings, Tesla states that it is "highly dependent on the services of Elon Musk,"[22] and acknowledges that if it were to lose Musk's services, the loss would "disrupt [Tesla's] operations, delay the development and introduction of [its] vehicles and services, and negatively impact [its] business, prospects and operating results as well as cause [its] stock price to decline."[23] For his part, Musk has stated publicly that if he had not assumed the role of CEO "the company wasn't going to make it."[24] On an August 1, 2016 conference call (the same day Tesla announced the Acquisition), Musk repeatedly referred to Tesla as "my company."[25]

---

[20] Compl. ¶¶ 2, 60, 271.

[21] Compl. ¶ 271.

[22] Compl. ¶ 20.

[23] Compl. ¶ 274.

[24] Compl. ¶ 271.

[25] Compl. ¶ 116.

Musk also served as the Chairman of the SolarCity Board since its formation in 2006.[26] He was SolarCity's largest stockholder, holding approximately 21.9% of the common stock prior to the Acquisition.[27] As a result of the Acquisition, Musk's SolarCity holdings were converted to over $500 million of Tesla shares.[28] It is alleged that Musk has publicly maintained that Tesla, SolarCity and SpaceX form a "pyramid" on top of which he sits, and that it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid . . . falters."[29]

Defendant Buss has been a Tesla Board member since 2009.[30] Tesla's 2015 proxy statement acknowledges that Buss is not an independent director.[31] In fiscal year 2015, Buss earned $4,954,785 as a Tesla director.[32] From August 2014 until February 2016, Buss served as SolarCity's Chief Financial Officer ("CFO"), for

---

[26] Compl. ¶ 24.

[27] *Id.*

[28] Plaintiffs allege facts about a third company, Space Exploration Technologies Corporation ("SpaceX"), a private aerospace manufacturer and space transport services company that Musk founded. Compl. ¶ 25. Musk has served as the CEO, CTO and Chairman of the Board of Directors of SpaceX since 2002. *Id.*

[29] Compl. ¶ 5.

[30] Compl. ¶ 26.

[31] Compl. ¶ 28; Moritz Aff., Ex. 13, at TESLA00001483.

[32] Compl. ¶ 29.

6

which he received total compensation of $32 million.[33]  After his departure from SolarCity's management, Buss remained at SolarCity as either an employee or consultant through at least December 31, 2016.[34]  He beneficially owned 37,277 shares of SolarCity common stock at the time of the Acquisition.[35]

Defendant Denholm has been a Tesla Board member since August 2014.[36] She chairs the Board's Audit Committee and is a member of its Compensation and Nominating and Governance Committees.[37]  As a Tesla director, Denholm earned $7,181,066 in 2014 and $4,979,785 in 2015.[38]  From July 2013 until February 2016, Denholm served as Executive Vice President, CFO and Chief Operations Officer at Juniper Networks, Inc. ("Juniper").[39]  She left Juniper in July 2016 and did not return to full-time employment until sometime in 2017.[40]

---

[33] Compl. ¶¶ 27, 29.

[34] *Id.*

[35] Compl. ¶ 27.

[36] Compl. ¶ 31.

[37] *Id.*

[38] Compl. ¶ 33.

[39] Compl. ¶ 32.

[40] Compl. ¶¶ 32–33.

Defendant Ehrenpreis has been a Tesla Board member since May 2007.[41] He chairs the Board's Compensation and Nominating and Governance Committees.[42] Ehrenpreis is an investor in, and serves on the board of directors of, Mapbox, Inc., which provides custom online maps.[43] Tesla and Mapbox entered into an agreement in December 2015 pursuant to which Tesla pays Mapbox ongoing fees, including $5 million over the first twelve months of the agreement.[44]

Ehrenpreis is also a managing partner and co-owner of a venture capital firm, DBL Partners, which he co-founded with fellow managing partner and co-owner Nancy Pfund.[45] Pfund was an observer on the Tesla Board from 2006 to 2010.[46] She was also a member of the SolarCity Board and one of two members of the SolarCity Board's special committee that negotiated and approved the Acquisition.[47] Pfund is the managing director and founder of DBL Investors, LLC ("DBL Investors"), which contributed at least $3.6 million over three of SolarCity's

---

[41] Compl. ¶ 34.

[42] *Id.*

[43] Compl. ¶ 38.

[44] *Id.*

[45] Compl. ¶ 35. Plaintiffs allege Ehrenpreis is also a manager of DBL Partners Fund III ("DBL III"), and that both Ehrenpreis and DBL III are SpaceX investors. Compl. ¶ 39.

[46] *Id.*

[47] *Id.*

8

funding rounds.[48]   At the time of the Acquisition, Pfund beneficially owned 1,554,114 shares of SolarCity common stock.[49]   She is a close friend of Musk's and has said that "[h]e's always been a master of the universe in my mind."[50]

Defendant Gracias has served on the Tesla Board since May 2007.[51]   Gracias has been Tesla's Lead Independent Director since September 2010.[52]   In that role, Gracias has "broad authority to direct the actions of [Tesla's] independent directors."[53]   Musk and Gracias are close friends; indeed, Musk gave Gracias the second Tesla Roadster ever made.[54]   Gracias also served on SolarCity's Board at the time of the Acquisition and beneficially owned 211,854 shares of SolarCity common stock.[55]

In addition, Gracias is founder, managing partner, CEO, Chief Investment Officer, director and sole owner of private equity firm Valor Management Corp.,

---

[48] Compl. ¶ 36.  DBL Investors has also invested in SpaceX.  Compl. ¶ 39.

[49] Compl. ¶ 36.  At the deal price of $25.37 per share, this ownership block is worth approximately $39.4 million.

[50] *Id.*

[51] Compl. ¶ 40.

[52] Compl. ¶ 46.

[53] *Id.*

[54] Compl. ¶ 45.

[55] Compl. ¶¶ 42–43.  Gracias also served on the board of directors of SpaceX at the time of the Acquisition.  Compl. ¶ 42.

which does business as Valor Equity Partners ("Valor").[56]  Valor and Gracias have participated in several pre-IPO funding rounds for Tesla and SolarCity.[57]  Through Valor funds, Gracias participated in four Tesla venture funding rounds between 2005 and 2008, as well as a pre-IPO venture debt raise in 2009.[58]  Prior to Tesla's IPO, Valor owned nearly five million Tesla shares.[59]  Gracias and his Valor funds also contributed nearly $25 million to SolarCity's pre-IPO preferred stock financing round.[60]  Musk has invested $2 million in each of two Valor funds.[61]

Defendant Jurvetson has served as a Tesla Board member since June 2009.[62] He serves on the Board's Audit Committee.[63]  In fiscal year 2015, Jurvetson earned $6,095,984 as a Tesla director.[64]  Musk and Jurvetson are also close friends,

---

[56] Compl. ¶ 41.

[57] Compl. ¶ 42.  Gracias and Valor also participated in several pre-IPO venture funding rounds for SpaceX.  *Id.*  In fact, Gracias has been a long time investor in Musk's enterprises, dating back to PayPal, an online financial services and e-mail payment company that Musk founded in 1999.  Compl. ¶ 42 n.4.

[58] Compl. ¶ 42 n.5.

[59] *Id.*

[60] *Id.*  Valor funds also participated in two SpaceX funding rounds in 2010 and 2015.  *Id.*

[61] Compl. ¶ 44.

[62] Compl. ¶ 47.

[63] *Id.*

[64] *Id.*

evidenced in part by the fact that Musk gave Jurvetson the first Tesla Model S and the second Tesla Model X ever made. [65] Jurvetson owned 417,450 shares of SolarCity common stock at the time of the Acquisition. [66]

Jurvetson is a managing director of venture capital firm Draper Fisher Jurvetson ("DFJ"). [67] Between 2006 and 2008, before Tesla's IPO in 2010, DFJ invested in three of Tesla's venture funding rounds, but it has not held Tesla stock since late 2014 or early 2015. [68] DFJ was also invested in SolarCity. After its initial investment in 2006, between 2006 and 2011, DFJ invested at least $18.9 million in SolarCity via four venture capital funding rounds. [69] At the time of the Acquisition, funds managed by DFJ beneficially owned 3,308,266 shares of SolarCity common

---

[65] Compl. ¶ 48 n.6.

[66] Compl. ¶ 49.

[67] Compl. ¶ 48.

[68] *Id.*

[69] Compl. ¶ 49 n.7. Additionally, DFJ participated in four early venture funding rounds of SpaceX between 2009 and 2015. Compl. ¶ 50 n.10. Indeed, according to Tesla's 2016 annual proxy statement, DFJ is a "significant stockholder" of SpaceX. Compl. ¶ 50. Jurvetson and two other DFJ managing directors, John H.N. Fisher and Randall S. Glein, all serve on the board of directors of SpaceX. *Id.*

stock, amounting to approximately 3.3% of the shares outstanding.[70] Musk invests in DFJ and one of Musk's trusts is a limited partner in a DFJ fund.[71]

Defendant Kimbal has served on the Tesla Board since April 2004.[72] He is Musk's brother and cousin of Lyndon and Peter, SolarCity's co-founders.[73] Tesla's SEC filings acknowledge that Kimbal is not an independent director.[74] In fiscal year 2015, Kimbal earned $4,964,381 as a Tesla director.[75] He owns an unspecified amount of Tesla shares.[76] At the time of the Acquisition, Kimbal also beneficially owned 147,541 shares of SolarCity common stock.[77] Additionally, Kimbal is a limited partner in two Valor funds, and Musk has invested in one of those funds.[78]

---

[70] Compl. ¶ 49. At the Acquisition price of $25.37, this ownership block is worth approximately $83.9 million.

[71] Compl. ¶ 51. Musk and DFJ co-founder Tim Draper have invested in other ventures together. Compl. ¶ 52. Fisher (as noted, a DFJ managing director) was a SolarCity director at the time of the Acquisition and owned 452,868 shares of SolarCity stock. Compl. ¶ 49.

[72] Compl. ¶ 53.

[73] *Id.* Kimbal is also a director of SpaceX. Compl. ¶ 56.

[74] Compl. ¶ 53.

[75] Compl. ¶ 55.

[76] *See* Compl. ¶¶ 53–58.

[77] Compl. ¶ 54.

[78] Compl. ¶ 57.

The Company's SEC filings acknowledge that the "concentration of ownership among [Tesla's] existing executive officers, directors and their affiliates may prevent new investors from influencing significant corporate decisions,"[79] and that "these stockholders will be able to exercise a significant level of control over all matters requiring stockholder approval, including the election of directors, amendment of our certificate of incorporation and approval of significant corporate transactions."[80]

## B. The Tesla-SolarCity Connections

Martin Eberhard and Marc Tarpenning, two Silicon Valley engineers, founded Tesla in 2003, with the goal of proving "that electric cars could be better than gasoline-powered cars." [81] Tesla initially focused on designing, developing, manufacturing and selling high-performance fully electric vehicles and advanced electric vehicle powertrain components.[82] In 2013, the Company began producing and selling home energy storage systems and then entered the commercial and utility

---

[79] Compl. ¶ 275.

[80] *Id.*

[81] Compl. ¶ 59.

[82] Compl. ¶ 63.

energy storage business in 2014.[83]  Nevertheless, Tesla's primary source of revenue remains the sale of its vehicles.[84]

Musk became involved with Tesla soon after it was formed.  In 2004, Musk led Tesla's Series A round of financing and became Chairman of the Board pursuant to a Series A voting agreement.[85]  Over the next few years, Musk participated in Tesla's Series B, C, D and E venture funding rounds.[86]  Musk led the Series B round of funding and co-led the Series C round.[87]  Prior to Tesla's IPO, Musk had invested approximately $70 million in the Company.[88]

"In November 2007, Musk forced founder and then-CEO Eberhard out of the Company."[89]  He appointed himself CEO in October 2008.[90]  Around that time,

---

[83] *Id.*

[84] *Id.*

[85] Compl. ¶ 60.

[86] *Id.*

[87] Compl. ¶ 269.

[88] Compl. ¶ 60.

[89] Compl. ¶ 61.

[90] *Id.*

14

Tesla encountered financial trouble.[91] Musk personally borrowed $20 million from SpaceX in early 2009 to help "keep Tesla afloat."[92]

Since Tesla's IPO in 2010, Musk has been the Company's largest stockholder, owning between 26.5% and 29% of its outstanding common stock, until he sold shares in May 2016 that reduced his ownership stake to 22.5%.[93] By September 2016, Musk owned 22.1% of Tesla's outstanding common stock.[94]

Musk, Lyndon and Peter founded SolarCity in 2006.[95] As noted, prior to the Acquisition, SolarCity was in the business of leasing solar panel equipment to residential and commercial customers.[96] Its primary source of revenue was lease payments received from its customers.[97] SolarCity took on substantial debt to

---

[91] *Id.*; Compl. ¶ 269.

[92] Compl. ¶ 61. Musk has financially supported Tesla and SolarCity on at least two other occasions where he extended his personal credit lines to inject capital into both Tesla and SolarCity. In early 2013, Musk increased his personal credit lines from $85 million to $300 million secured by substantial shares of Tesla and SolarCity stock. Compl. ¶ 67. From May 2013 to October 2013, Musk used his increased credit to acquire $100 million in Tesla stock and $10 million in SolarCity stock. *Id.* In 2015, Musk further increased his personal credit lines to $475 million and purchased $20 million in Tesla stock and $17.7 million in SolarCity stock. Compl. ¶ 68.

[93] Compl. ¶ 62.

[94] *Id.*

[95] Compl. ¶ 64.

[96] Compl. ¶ 65.

[97] *Id.*

finance its upfront costs associated with equipment and installation.[98] It completed an IPO in December 2012 and since then has suffered losses in every quarter except three.[99] Musk owned 21.9%, Lyndon owned 3.9% and Peter owned 3.8% of SolarCity's outstanding common stock at the time of the Acquisition.[100]

**C. SolarCity's Liquidity Challenges**

During the three years immediately preceding Tesla's June 2016 offer to acquire SolarCity, SolarCity's debt increased thirteen-fold, totaling $3.56 billion as of June 2016.[101] By any measure, SolarCity was in the midst of a liquidity crisis.[102] Its revolving credit facility (the "Revolver") contained a covenant requiring it to maintain a minimum cash balance of $116 million (exclusive of cash held in fund accounts), measured monthly.[103] Failure to maintain the minimum cash balance was an event of default, and a Revolver default would likely trigger cross-defaults on

---

[98] *Id.*

[99] Compl. ¶ 66.

[100] *Id.*

[101] Compl. ¶ 69.

[102] Compl. ¶ 71.

[103] *Id.* (citing TESLA00000740).

other debt instruments.[104] SolarCity also faced the prospect of defaulting on its non-recourse debt, which, in turn, could trigger a cross-default under the Revolver.[105]

In February 2016, a SolarCity Board presentation (the "February 2016 SolarCity Board Presentation") acknowledged that the company faced "significant liquidity concerns" and that SolarCity's cash balance would not meet the Revolver's required level at least three times in 2016—in May, August and September.[106] To make matters worse, $1.23 billion of SolarCity's debt was scheduled to become due by the end of 2017.[107] Musk, Gracias and Buss attended the February 2016 meeting and were well aware of SolarCity's "significant liquidity concerns" at the time Musk brought the proposed acquisition of SolarCity to the Tesla Board.[108]

The debt and equity markets were effectively closed to SolarCity. It had already issued nearly 25 million additional shares since its December 2012 IPO, and its stock had declined in value approximately 64% from February 2015 to February 2016.[109] The credit markets were no more forgiving. SolarCity already held

---

[104] *Id.*

[105] Compl. ¶ 72.

[106] Compl. ¶¶ 73, 83 (citing and quoting TESLA00000740).

[107] Compl. ¶ 73.

[108] *Id.*

[109] Compl. ¶ 82.

substantial debt and had recently attempted to raise capital via bond offerings ("Solar Bonds").[110]

In September 2016, SolarCity and its subsidiary, Silevo, Inc., were sued for allegedly misappropriating trade secrets and intellectual property and engaging in other violations of law relating to solar cell shingling technology.[111] The plaintiffs in that litigation sought, *inter alia*, "a permanent injunction prohibiting SolarCity and Silevo's use of the misappropriated information and prosecution of certain patent applications."[112] The litigation presented particular concerns for SolarCity (and soon for Tesla) "given Musk's public statements that Silevo would be the driver of any synergies in the Acquisition and [is] the gem of SolarCity."[113]

**D. Musk Persistently Presents the SolarCity Transaction to the Board**

The Tesla Board held a special meeting on February 29, 2016.[114] At the meeting, Musk and Tesla CFO, Jason Wheeler, presented a preliminary plan for

---

[110] Compl. ¶ 76.  SpaceX was the largest holder of Solar Bonds.  Compl. ¶ 77.  In March 2015, SpaceX bought $90 million in Solar Bonds, and then $75 million in June 2015 and $90 million in March 2016.  *Id.*  In November 2015, a Musk-affiliated entity acquired $10 million in Solar Bonds and Lyndon purchased $3 million.  *Id.*  When SolarCity sought to raise $124 million in an August 2016 bond offering, Musk purchased $65 million of these Solar Bonds, and Lyndon and Peter each purchased $17.5 million.  Compl. ¶ 78.

[111] Compl. ¶ 80.

[112] *Id.*

[113] Compl. ¶ 81.

[114] Compl. ¶ 85 (citing TESLA00001346).

18

Tesla to acquire SolarCity.[115] Musk led the presentation.[116] The stated purpose of the proposed transaction was "to complement the Company's Energy business, grow the Sales operations of the Company and to create other product, service and operational synergies through the combination of the companies."[117] Musk's focus was on a potential acquisition of SolarCity; he did not mention and the Board did not consider other companies in the solar industry or other strategic transactions.[118] The Board "decided not to proceed with an offer to SolarCity at [that] time because of the potential impact on the management team's time and resources in the near term."[119]

Two weeks passed, and Musk was before the Tesla Board again to propose a possible acquisition of SolarCity (and only SolarCity) during the Board's March 15, 2016 meeting.[120] And, again, the Board deferred the discussion.[121]

---

[115] *Id.* This presentation, perhaps coincidentally, occurred in the same month as the February 2016 SolarCity Board Presentation.

[116] *Id.*

[117] Compl. ¶ 86.

[118] *Id.* Musk ruled out as "unworkable" a joint venture between Tesla and SolarCity in lieu of an acquisition. Compl. ¶ 87.

[119] Compl. ¶ 89 (quoting TESLA00001347).

[120] Compl. ¶ 90.

[121] *Id.*

Less than three months later, on May 31, 2016, at a regularly scheduled meeting of the Board, Musk was back to propose (again) a possible acquisition of SolarCity.[122]  This time, the Board appeared to share Musk's view of "the possible benefits . . . [of] acquiring a solar energy company in the context of the Company's strategic plan."[123]  The minutes of the meeting reflect that "the Board discussed the possibility of evaluating an acquisition of SolarCity Corporation . . . as a potential target of opportunity in the solar energy space."[124]  Once again, SolarCity was the only target on which the Board trained its sight.[125]

At the conclusion of the May 31 meeting, the Tesla Board authorized Musk and management to (a) assess a potential acquisition of a solar energy company; (b) engage an independent financial advisor on behalf of the Tesla Board and the Company; and (c) instruct the law firm Wachtell, Lipton, Rosen & Katz to undertake a review of a potential acquisition by Tesla.[126]  Musk, as CEO, retained Wachtell as

---

[122] Compl. ¶ 91 (citing TESLA00001455–56).

[123] Compl. ¶ 92.  Tesla's strategic plan is the "Master Plan" that Musk authored in 2006 and updated in 2016 as "Master Plan, Part Deux."  Compl. ¶¶ 92, 138.  The Master Plan contemplated that Tesla would "provide solar power."  Compl. ¶ 140.  In his Master Plan, Part Deux, Musk emphasized that the phrase "provide solar power" "has literally been on [Tesla's] website for 10 years."  *Id.*

[124] Compl. ¶ 92 (quoting TESLA00001455).

[125] *Id.*

[126] Compl. ¶ 93 (citing TESLA00001456).

20

legal advisor and Evercore Partners as financial advisor to advise both Tesla's Board and Tesla's management.[127] "Despite the Tesla Board members' obvious conflicts in considering an acquisition of SolarCity, the Tesla Board did not form a special committee" to consider the potential acquisition.[128]

The Tesla Board called a special meeting for June 20, 2016 (the "June 2016 Special Meeting") "to further explore a potential strategic transaction between the Company and a participant in the solar energy industry."[129] Musk opened the meeting by "remind[ing] the board that the issue [of acquiring SolarCity] had been raised and discussed but ultimately deferred at previous meetings and review[ing] some of the strategic considerations that the board had evaluated at those previous meetings."[130] It is alleged that, as if on cue, the Board heeded Musk's "tacit order" and promptly authorized its advisors to make an offer for SolarCity.[131]

The Board's first meeting with Evercore occurred during the June 2016 Special Meeting, the same meeting where the Board approved the offer to acquire

---

[127] Compl. ¶ 94.

[128] *Id.*

[129] Compl. ¶ 97 (quoting TESLA00001459).

[130] Compl. ¶ 98 (quoting TESLA00001459).

[131] *Id.*; Compl. ¶ 102.

SolarCity.[132] The meeting minutes reflect that although Evercore's presentation included a brief analysis of "various potential targets," the Board did not discuss potential acquisitions of any target other than SolarCity.[133] This is surprising, to say the least, given that "Goldman Sachs & Co., which was a co-underwriter in Tesla's $2 billion secondary stock offering that was issued just weeks earlier, publicly stated that SolarCity was the 'worst positioned' company in the solar energy sector for capitalizing on future growth in the industry."[134]

Musk and Gracias, both directors of Tesla and SolarCity, recused themselves from the June 2016 Special Meeting while the remaining members of the Board voted to approve the offer for SolarCity.[135] But both remained for the entirety of the meeting while the potential acquisition of SolarCity was discussed, and Musk led most of those discussions.[136] When the time came for the vote, the Board approved and adopted the offer on the same terms discussed when Musk and Gracias were present.[137]

---

[132] Compl. ¶¶ 95–96.

[133] Compl. ¶ 100.

[134] Compl. ¶ 99.

[135] Compl. ¶¶ 98, 102.

[136] Compl. ¶¶ 98, 100–102. *See also* Moritz Aff., Ex. 9, at TESLA00001461.

[137] Compl. ¶ 102 (citing TESLA00001462–63).

22

**E. The Offer for SolarCity**

On June 21, 2016, Tesla announced its offer to acquire SolarCity in a stock-for-stock transaction at an exchange ratio of 0.122x to 0.131x (the "Offer").[138] The Offer valued SolarCity at $26.50 to $28.50 per share, the equivalent of $2.6 to $2.8 billion.[139] The proposed purchase price reflected a 21% to 30% premium to SolarCity's closing price on June 20, 2016.[140]

Musk was active in his sponsorship and backing of the Offer and the eventual Acquisition both before and after the announcement of the deal. First, during a June 22, 2016, call with investors and analysts, one day after Tesla announced the Offer, Musk stated:

> Like the opinion is unanimous for both companies. So, I mean, unless there's something discovered that like that I have no idea about or just that nobody on the board has any idea about, which is extremely unlikely, then the board would—the independent board members would recommend in favor of completing a transaction somewhere in the price range that was mentioned, most likely.[141]

Then, during the due diligence period, Musk reached out to "certain institutional investors" to garner support for the Acquisition.[142] It is alleged that,

---

[138] Compl. ¶ 103.

[139] *Id.*

[140] *Id.*

[141] Compl. ¶ 118.

[142] Compl. ¶ 127 (quoting TESLA00001476).

"by ensuring an 'Increasing View of Deal Certainty' in the market through his public statements that nothing would be revealed in due diligence that would derail the Acquisition, as well as conversations with institutional investors, Elon Musk forced the Tesla Board into a position in which they had no choice but to follow through with the Acquisition."[143]

And finally, one month following the announcement of the Offer, on July 20, 2016, Musk published his "Master Plan, Part Deux" to Tesla's website.[144] This "manifesto" of sorts updated the original Master Plan that Musk published in 2006 and detailed Musk's vision for Tesla's future.[145] The Master Plan, Part Deux, states, in relevant part:

> The first master plan that I wrote 10 years ago is now in the final stages of completion. It wasn't all that complicated and basically consisted of:
>
> 1. Create a low volume car, which would necessarily be expensive
> 2. Use that money to develop a medium volume car at a lower price
> 3. Use that money to create an affordable, high volume car
>
> And . . .
>
> Provide solar power. No kidding, this has literally been on our website for 10 years.
>
> . . .

---

[143] Compl. ¶ 128.

[144] Compl. ¶ 138.

[145] *Id.*

The point of all this was, and remains, accelerating the advent of sustainable energy, so that we can imagine far into the future and life is still good.

. . . Here is what we plan to do to make that day come sooner:

. . . We can't do this well if Tesla and SolarCity are different companies, which is why we need to combine and break down the barriers inherent to being separate companies. That they are separate at all, despite similar origins and pursuit of the same overarching goal of sustainable energy, is largely an accident of history. Now that Tesla is ready to scale Powerwall and SolarCity is ready to provide highly differentiated solar, the time has come to bring them together.[146]

The "Master Plan, Part Deux" reflects "that the Acquisition [was] being driven by Elon Musk, as it has been a component of his strategy for Tesla for at least ten years."[147]

## F. Due Diligence Reveals SolarCity's Liquidity Crisis and Other Issues

In a July 5, 2016 presentation to the Tesla Board, Evercore warned the Board that SolarCity had $3.164 billion in outstanding debt as of March 31, 2016, and that significant debt would mature in a three-to-five year window.[148] According to

---

[146] Compl. ¶ 140.

[147] *Id.*

[148] Compl. ¶ 129.

Evercore, a Tesla-SolarCity combined company would have "58% and 89% of pro forma debt mature within 3 and 5 years, respectively."[149]

At its July 19, 2016 special meeting, the Tesla Board discussed SolarCity's liquidity situation.[150] As predicted in the February 2016 SolarCity Board Presentation, SolarCity was heading towards cash balances below the minimum level required by the Revolver for the weeks of July 22, August 5 and August 12.[151] With this default looming, SolarCity once again offered its Solar Bonds to the market. As noted, Musk, Lyndon and Peter answered the call by acquiring $100 million of the bonds between the three of them.[152]

In more bad news, due diligence revealed issues with SolarCity's new manufacturing facility planned for Buffalo, New York (the "Buffalo Factory").[153] SolarCity had planned to shutter its China-based manufacturing facility and move production to Buffalo, New York.[154] As an incentive for the move to Buffalo, the state of New York offered SolarCity tax credits, a loan to fund the Buffalo Factory

---

[149] *Id.* (quoting TESLA00000246).

[150] Compl. ¶ 121.

[151] Compl. ¶ 123 (citing TESLA00000740).

[152] Compl. ¶ 130.

[153] Compl. ¶ 131.

[154] Compl. ¶¶ 131–32.

build and a grant worth hundreds of millions of dollars.[155] In exchange, SolarCity was required to invest $5 billion over ten years in total capital and operational expenditures in New York State and was obligated to employ 5,000 people within ten years of factory completion.[156] If SolarCity failed to meet certain targets, it would be liable to New York for $41.2 million per year for each year it failed to meet any of the milestones.[157] As discovered in Tesla's due diligence, SolarCity's Buffalo Factory was behind schedule, its costs were projected to be higher than those carried in the industry and its "projected installed cost per watt for Silevo modules [the principal product coming off the line] carried a $0.20 premium above the industry in 2019 and beyond."[158]

## G. Evercore's Discounted Cash Flow Analyses

Evercore performed two discounted cash flow valuation ("DCF") analyses of SolarCity as part of its fairness analysis.[159] The first DCF relied on SolarCity management's forecasts provided to Evercore in mid-July 2016 (the "SolarCity

---

[155] Compl. ¶ 132.

[156] Compl. ¶ 133 (citing TESLA00000738).

[157] Compl. ¶ 134 (citing TESLA00000738).

[158] Compl. ¶ 135 (citing TESLA00000705). If Tesla abandoned the Buffalo Factory after the Acquisition, it would potentially be liable for approximately $646 million in termination fees. Compl. ¶ 136 (citing TESLA00000872–73).

[159] Compl. ¶ 170.

Unrestricted Liquidity Case").[160] Tesla's management, led by Musk, provided Evercore with adjustments to revise the SolarCity Unrestricted Liquidity Case downward to create a revised sensitivity case (the "SolarCity Revised Sensitivity Forecasts.")[161] The SolarCity Revised Sensitivity Forecasts reduced certain SolarCity projections, which consequently decreased cash requirements.[162] This sensitivity case also reduced overhead and research and development costs by ten percent and increased litigation cost projections.[163] Evercore performed a second DCF analysis using the SolarCity Revised Sensitivity Forecasts.[164] Both DCF analyses yielded per share value ranges supporting the Acquisition price and ultimately Evercore's July 30, 2016 fairness opinion.

Later, in August 2016, SolarCity management provided the Tesla Board and Evercore with a second forecast that was less optimistic than the mid-July 2016 forecast (the "SolarCity Liquidity Management Case").[165] SolarCity's financial advisor performed DCF analyses using the SolarCity Liquidity Management Case,

---

[160] *Id.*

[161] Compl. ¶ 171 (citing TESLA00001120).

[162] Compl. ¶ 172 (citing TESLA00000879).

[163] *Id.*

[164] Compl. ¶ 173.

[165] Compl. ¶ 174 (citing TESLA00001759–60).

which derived per share value ranges for SolarCity below the Acquisition price.[166] Initially, SolarCity's financial advisor calculated a per share equity value reference range for SolarCity of approximately $6.75 to $19.25.[167] After adjusting for a "computational error," the SolarCity DCF analysis yielded values for SolarCity of $10.50 to $23.25 per share.[168]

Evercore did not perform an additional DCF analysis using the SolarCity Liquidity Management Case, nor did Evercore otherwise revise its valuation of SolarCity.[169] The Board did not request that Evercore perform such an analysis.[170] At an August 25, 2016 special meeting, Evercore advised the Board, without analysis, that the SolarCity Liquidity Management Case did not alter its prior valuation.[171] The Board likewise determined that the new information did not "change[] its view as to the value of SolarCity."[172]

---

[166] Compl. ¶ 175.

[167] *Id.*

[168] *Id.*

[169] Compl. ¶ 176.

[170] *Id.*

[171] *Id.*

[172] *Id.*

**H. Tesla and SolarCity Announce the Merger Agreement**

On August 1, 2016, Tesla and SolarCity announced they had executed an Agreement and Plan of Merger dated July 31, 2016 (the "Merger Agreement"), pursuant to which Tesla would acquire SolarCity in an all-stock deal.[173] The Merger Agreement provided for each share of SolarCity common stock to be converted to 0.110 shares of Tesla common stock (the "Exchange Ratio").[174] While this Exchange Ratio was slightly lower than the 0.122x to 0.131x range that the Tesla Board approved at the June 2016 Special Meeting, it was within the range initially proposed without the benefit of any due diligence on SolarCity.[175] The Acquisition price valued SolarCity at approximately $2.6 billion, or $25.37 per share of SolarCity stock based on the five-day volume weighted average price of Tesla shares as of July 29, 2016, the last trading day prior to the announcement of the Acquisition.[176]

The Complaint alleges the Acquisition was a bailout of SolarCity that benefited six of the seven members of the Tesla Board and/or their family members,

---

[173] Compl. ¶¶ 4, 142.

[174] Compl. ¶ 143.

[175] Compl. ¶¶ 144, 145.

[176] Compl. ¶ 143. The per share Acquisition price was $25.83 per SolarCity share if based on Tesla's closing price as of July 29, 2016, the last trading day prior to the execution of the Merger Agreement.

businesses and business partners.[177] Specifically, the Acquisition benefited: (a) Musk, Kimbal and their cousins, Peter and Lyndon; (b) Gracias and the investment fund he manages; (c) Jurvetson, his venture capital firm and his firm's managing director; (d) Ehrenpreis' venture capital partner; and (e) Buss.[178]

## I. The Tesla Stockholders Approve the Acquisition

On November 17, 2016, Tesla stockholders voted to approve the Acquisition.[179] The Merger Agreement excluded from the vote certain Tesla stockholders (and their affiliates) who were also directors or executive officers of SolarCity, including Musk, Gracias and Jeffrey Straubel.[180] Kimbal, Jurvetson, Ehrenpreis, Buss, Tesla executive officers and any other Tesla stockholders who also owned stock in SolarCity were not excluded from the vote tally.[181] As of the record date for the stockholder vote, excluding shares held by Musk, Gracias, Straubel and their affiliates, 118,044,090 shares of Tesla common stock were outstanding and entitled to vote. Of these, 68,788,787 voted in favor of the Acquisition.[182] Thus,

---

[177] Compl. ¶ 7.

[178] *Id.*

[179] Compl. ¶¶ 223, 225.

[180] Compl. ¶ 223.

[181] Compl. ¶ 224.

[182] Compl. ¶ 225.

31

according to Tesla, an "overwhelming" majority of Tesla's disinterested stockholders voted to approve the Acquisition.[183]

The Acquisition closed on November 21, 2016.[184] Musk, Lyndon and Peter became executive officers of the surviving SolarCity subsidiary of Tesla.[185] And with the stroke of a pen, Tesla's debt load nearly doubled.[186]

## J. Procedural Posture

On September 1, 2016, the first of several lawsuits challenging the Acquisition was filed in this Court.[187] Following the presentation of several motions for the appointment of lead plaintiff and lead counsel, the Court selected a leadership team that had filed a complaint enhanced by the incorporation of Section 220

---

[183] Defs.' Opening Br. 1. Plaintiffs contend that institutional stockholders who held equity positions in both Tesla and SolarCity should have been excluded from the vote tally for purposes of assessing the results and effect of the allegedly "disinterested" vote. Compl. ¶¶ 226–28. In doing so, they rely on a document among the Section 220 Documents that purportedly reflects that among Tesla's top twenty-five institutional investors, those holding 45.7% of Tesla's stock (66,658,000 shares) also held SolarCity stock at the time of the Acquisition. Compl. ¶ 226 (citing TESLA00000243). This issue may resurface in the event Defendants renew their ratification defense later in these proceedings.

[184] Compl. ¶ 230.

[185] Compl. ¶ 150.

[186] Compl. ¶ 153. As of June 30, 2016, Tesla's indebtedness was approximately $3.7 billion and SolarCity's was approximately $3.3 billion. *Id.*

[187] *See* Dkt. 1.

Documents.[188] That complaint did not allege any disclosure violations. Once selected, lead counsel informed the Court that Plaintiffs were foregoing expedition and would not seek to enjoin the transaction, including on disclosure grounds, presumably to reserve their disclosure claims as bases to resist an anticipated *Corwin* ratification defense.[189] Defendants raised that defense in their motion to dismiss the first amended complaint on January 27, 2017.[190] Plaintiffs opted to amend the first amended complaint with the operative Complaint on March 9, 2017.[191] That Complaint included what the first amended complaint omitted—allegations of inadequate pre-vote disclosures in support of a post-vote disclosure claim. Defendants moved to dismiss the Complaint on March 17, 2017.[192]

The Complaint asserts seven claims: four derivative claims and three direct claims on behalf of Plaintiffs and a putative class of Tesla stockholders.[193] The derivative claims are: Count I, a derivative claim for breach of fiduciary duty against

---

[188] Dkt. 93.

[189] Dkt. 91 at 47–48; Dkt. 89.

[190] Dkt. 97, 98.

[191] Dkt. 102.

[192] Dkt. 104.

[193] Compl. ¶¶ 294–330. Defendants do not move to dismiss under Court of Chancery Rule 23.1. *See* Dkt. 104; Dkt. 110. Accordingly, I need not address the Complaint's demand futility allegations. *See* Compl. ¶¶ 231–82.

Musk as Tesla's controlling stockholder for using "his control over the corporate machinery to, among other things, orchestrate Board approval of the Acquisition"[194]; Count II, a derivative claim for breach of the duty of loyalty against the Board for "causing and/or allowing Tesla to enter into the self-dealing" Acquisition[195]; Count III, a derivative claim for unjust enrichment against Musk, Kimbal, Gracias, Buss and Jurvetson, based on their ownership of SolarCity stock at the time of the Acquisition and the fact that the Acquisition "bail[ed] out" SolarCity thereby "spread[ing] across all of Tesla's stockholders the loss that would otherwise be experienced only by" these five individuals[196]; and Count VI, a derivative claim for waste against the Board for causing Tesla to acquire SolarCity.[197]

The direct individual and class claims are: Count V, a direct claim against Musk for breach of fiduciary duty as Tesla's controlling stockholder by "causing Tesla to enter into the self-dealing Acquisition at a price that is unfair to the Company in order to unduly benefit himself . . . through the improper transfer of economic and voting power" from the other stockholders to himself[198]; Count IV, a

---

[194] Compl. ¶ 296.

[195] Compl. ¶ 301.

[196] Compl. ¶ 304.

[197] Compl. ¶ 322.

[198] Compl. ¶ 316.

direct claim against the Board for breach of the fiduciary duties of loyalty and care by approving and executing the Acquisition, which "unduly benefit[ted] controlling stockholder Elon Musk . . . through the improper transfer of economic and voting power from the other stockholders" to Musk[199]; and Count VII, a direct claim against the Board for breach of the duty of disclosure for failure to make accurate and non-misleading disclosures to Tesla's stockholders in connection with the Acquisition and any stockholder vote, including regarding the circumstances surrounding the Acquisition.[200]

The parties presented argument on Defendants' motion to dismiss on December 12, 2017.[201] On December 20 and 21, 2017, the parties submitted post-argument letters addressing a recent Delaware Supreme Court decision relating to the controlling stockholder issue.[202] This is the Court's decision on Defendants' motion to dismiss the Complaint.

---

[199] Compl. ¶ 310.

[200] Compl. ¶ 328–29.

[201] Dkt. 124.

[202] Dkt. 125; Dkt. 126. The parties addressed the Supreme Court's analysis in *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd*, 177 A.3d 1 (Del. 2017) of the trial court's findings regarding whether Michael Dell was a controlling stockholder.

## II. ANALYSIS

Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts as pled in the complaint.[203] In considering a motion to dismiss, the court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor.[204] The court need not accept, however, conclusory allegations that lack factual support or "accept every strained interpretation of the allegations proposed by the plaintiff."[205]

Defendants' showcase defense rests on *Corwin*. Although Tesla stockholder approval of the Acquisition was not required by the Delaware General Corporation Law, the Tesla Board submitted the Acquisition for stockholder approval anyway. Defendants maintain that the fully informed, uncoerced vote of the disinterested stockholders mandates business judgment review of Plaintiffs' breach of fiduciary

---

[203] *Gen. Motors*, 897 A.2d at 168.

[204] *Id. See also Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (stating the court is required to accept "reasonable inferences that logically flow" from the non-conclusory facts pled); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659–60 (Del. Ch. 2013) (same).

[205] *Id.*

36

duty claims and dismissal of the Complaint.[206] Plaintiffs disagree on several grounds; first among them, Plaintiffs maintain that, as a matter of law, *Corwin* does not apply because the Acquisition benefited Tesla's controlling stockholder, Musk.[207] Because I agree the Complaint pleads facts that allow reasonable inferences that Musk was a controlling stockholder and that Plaintiffs' claims against all Defendants are subject to entire fairness review, I begin and end my analysis of the motion to dismiss there.

## A. The Controlling Stockholder Inquiry

In the seminal *Kahn v. Lynch Communications Systems, Inc.*, the Supreme Court observed that Delaware courts will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but "*exercises control* over the business affairs of the corporation."[208] Plaintiffs do not

---

[206] *Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016) (noting that dismissal is typically the result when pleading stage business judgment deference applies "because the vestigial waste exception has long had little real-world relevance").

[207] *See Merge Healthcare*, 2017 WL 395981, at *6 (clarifying that *Corwin* does not apply in controlling stockholder transactions); *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *6 n.28 (Del. Ch. Jan. 5, 2017) ("[T]he only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder") (quoting *Larkin v. Shah*, 2016 WL 4485447, at *10 (Del. Ch. Aug. 25, 2016)).

[208] 638 A.2d 1110, 1113–14 (Del. 1994) (emphasis in original).

dispute that Musk holds only 22.1% of the voting power in Tesla. Thus, the operative question is whether Musk, as a minority blockholder, "*exercises control over the business affairs of* [Tesla]."[209] Further refined, the inquiry is whether Musk "exercised actual domination and control over . . . [the] directors."[210] In this regard, his power must have been "so potent that independent directors . . . [could not] freely exercise their judgment."[211]

---

[209] *Id.*

[210] *Morton's Rest. Gp.*, 74 A.3d at 665 (stating the complaint must support the reasonable inference that the minority stockholder "exercised actual domination and control over . . . [the] directors") (internal quotation marks omitted) (citing *In re Sea-Land Corp. S'holders Litig.*, 1988 WL 49126, at *3 (Del. Ch. May 13, 1988)).

[211] *Id. See also Corwin*, 125 A.3d at 307 ("[T]he Court of Chancery, consistent with the instructions of this Court, looked for a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock.") (internal citations omitted); *Larkin*, 2016 WL 4485447, at *13 ("Making the showing [that the alleged controller wields such formidable voting and managerial power] is no easy task, as the minority blockholder's power must be so potent that it triggers the traditional *Lynch* concern that independent directors' free exercise of judgment has been compromised."); *In re PNB Hldgs. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) ("[S]tockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.").

"The requisite degree of control can be shown to exist generally or 'with regard to the particular transaction that is being challenged.'"[212] Stated differently, when pleading that a minority blockholder is a controlling stockholder, the plaintiff may plead either (or both) of the following: (1) that the minority blockholder actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged transaction or (2) that the minority blockholder actually dominated and controlled the majority of the board generally.[213] "[W]hether a large blockholder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual [and] it is a difficult [question] to resolve on the

---

[212] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013) (quoting *Williamson v. Cox Commc'ns Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006)). *See also In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014) ("These cases show that a large blockholder will not be considered a controlling stockholder unless they actually control the board's decisions about the challenged transaction."); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) ("However, the plaintiffs need not demonstrate that KKR oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough."); *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) ("In order to append the label of 'controlling shareholder,' pervasive control over the corporation's actions is not required; indeed, a plaintiff 'can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged.'") (quoting *Williamson*, 2006 WL 1586375, at *4).

[213] *In re Rouse Props., Inc. Fiduciary Litig.*, 2018 WL 1226015, at *12 (Del. Ch. Mar. 9, 2018).

pleadings."[214] Plaintiffs' burden now is to "show it is ***reasonably conceivable*** that [Musk] controlled [Tesla]."[215]

**B. It Is Reasonably Conceivable That Musk Is Tesla's Controlling Stockholder**

The parties proffer several factors to inform the Court's determination of whether the Complaint adequately pleads Musk's controller status. They include: (1) Musk's ability to influence the stockholder vote to effect significant change at Tesla, including the removal of Board members; (2) Musk's influence over the Board as Tesla's visionary, CEO and Chairman of the Board; (3) Musk's strong connections with members of the Tesla Board and the fact that a majority of the

---

[214] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 550–51 (Del. Ch. 2003). *See also Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) ("[T]here is no magic formula to find control; rather, it is a highly fact specific inquiry.") (citing *Crimson Exploration*, 2014 WL 5449419, at *10); *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *6–7 (Del. Ch. Nov. 26, 2014) (noting the inquiry of "whether or not a stockholder's voting power and managerial authority, when combined, enable him to control the corporation [ ] is not a formulaic endeavor and depends on the particular circumstances of a given case"), *rev'd on other grounds sub nom.*, *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173 (Del. 2015); *Zhongpin*, 2014 WL 6735457, at *9 n.33 ("Whether or not a particular CEO and sizeable stockholder holds more practical power than is typical should not be decided at the motion to dismiss stage if a plaintiff pleads facts sufficient to raise the inference of control."); *Williamson*, 2006 WL 1586375, at *6 ("The question whether a shareholder is a controlling one is highly contextualized and is difficult to resolve based solely on the complaint.").

[215] *Crimson Exploration*, 2014 WL 5449419, at *17 (emphasis added). *See also Zhongpin*, 2014 WL 6735457, at *7 ("Here, Plaintiffs do not need to prove that [the alleged controller] was a controlling stockholder in order to withstand the motions to dismiss. Rather, Plaintiffs must plead facts raising ***the inference*** that [the alleged controller] ***could control*** [the company].") (emphasis added)).

Tesla Board was "interested," as that term is defined in our law, in the Acquisition; and (4) Tesla's and Musk's acknowledgement of Musk's control in its public filings. The parties' focus on these considerations is well-placed, as each is tied directly to our controlling stockholder jurisprudence. Accordingly, I address each in turn below.

### 1. Musk's Control of the Vote

Musk is a 22.1% stockholder. In the controlling stockholder context, this ownership stake is "relatively low" reflecting a "small block."[216] Even so, "there is no absolute percentage of voting power that is required in order for there to be a finding that a controlling stockholder exists."[217] Indeed, "[a]ctual control over business affairs may stem from sources extraneous to stock ownership."[218] As illustrated in *Crimson Exploration*'s thorough study of significant cases where the parties disputed whether a minority stockholder was a controlling stockholder, there

---

[216] Defs.' Opening Br. 15 (citing *PNB Hldgs.*, 2006 WL 2403999, at *10 and *Larkin*, 2016 WL 4485447, at *14).

[217] *PNB Hldgs.*, 2006 WL 2403999, at *9; *Zhongpin*, 2014 WL 6735457, at *6 (citing *PNB Hldgs.*, 2006 WL 2403999, at *9). *Compare Zhongpin*, 2014 WL 6735457, at *1, 12 (finding it reasonably conceivable that a 17.3% stockholder was a controller), *with Crimson Exploration*, 2014 WL 5449419, at *15 (observing that to find a stockholder with a 33.7% ownership stake was a controller would be "aggressive"). *See also In re Alloy, Inc.*, 2011 WL 4863716, at *8 (Del. Ch. Oct. 13, 2011) (declining to rule out that a mere 15% stockholder could ever be considered a controller, but concluding that "collective stock ownership of 15% do[es] not, without specific allegations of domination, create an inference that [a stockholder] controlled the board").

[218] *Zhongpin*, 2014 WL 6735457, at *8.

41

is no "linear, sliding scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder."[219] The absence of a discernable pattern remains true in our post-*Crimson Exploration* controller decisions.[220]

Defendants view the controlling stockholder question as turning on the minority blockholder's ability to control the outcome of a contested election and the resulting perception of members of the board of directors that their future on the board rests in the alleged controller's hands.[221] According to Defendants, since Musk's 22.1% voting power is inadequate to dominate a contested election, he cannot be deemed a controlling stockholder.[222] Stated differently, Defendants'

---

[219] *Crimson Exploration*, 2014 WL 5449419, at *10.

[220] *Larkin*, 2016 WL 4485447, at *2 (finding 23.1% minority stockholder was not a controlling stockholder); *Calesa*, 2016 WL 770251, at *11 (holding it was reasonably inferable that a 26% stockholder was a controlling stockholder); *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 994 (Del. Ch. 2014) (granting motion to dismiss where the court could not reasonably infer that a 1% minority stockholder was a controlling stockholder), *aff'd sub nom. Corwin*, 125 A.3d 304; *Zhongpin*, 2014 WL 6735457, at *7–8 (finding it was reasonably conceivable that a 17.3% (26% if accounting for an alleged control group) blockholder wielded actual control).

[221] Defs.' Opening Br. 14–16 (citing *Cysive*, 836 A.2d at 551–52, *Morton's Rest. Gp.*, 74 A.3d at 665 and *KKR Fin.*, 101 A.3d at 994 and arguing "[a] 'minority blockholder' like Musk is not considered to be a controlling stockholder unless [he] exercises such formidable voting and managerial power that, as a practical matter, [he] is no differently situated than if [he] had majority voting control'") (quoting *Morton's Rest. Gp.*, 74 A.3d at 664–65).

[222] Plaintiffs have not attempted to allege or argue that Musk is part of a control group.

argument appears to be that the delta between Musk's 22.1% ownership stake and actual majority voting control is too great, regardless of other circumstances, for the Court reasonably to infer that Musk possessed dominating voting power. By Defendants' lights, this ends the inquiry. I disagree.

The ability of an alleged controller to influence a contested election is a significant consideration in the controlling stockholder analysis. That proposition cannot credibly be challenged.[223] But alleged control of the ballot box is not always dispositive of the controlling stockholder inquiry in the minority stockholder context. Indeed, our courts have considered "many factors . . . in analyzing whether a shareholder is controlling."[224] "[T]he focus of the [controller] inquiry [is] on the *de facto* power of a significant (but less than majority) shareholder, which, when *coupled with other factors*, gives that shareholder the ability to dominate the corporate decision-making process."[225] As discussed below, while Plaintiffs acknowledge that Musk's minority block is "relatively low," their Complaint pleads

---

[223] *See Cysive*, 836 A.2d at 551–52; *Morton's Rest. Gp.*, 74 A.3d at 665; *KKR Fin.*, 101 A.3d at 994.

[224] *Williamson*, 2006 WL 1586375, at *4. *See also Zhongpin*, 2014 WL 6735457, at *8 ("[T]he Court does not take an unduly restrictive view of the avenues through which a controller obtains corporate influence."); *Superior Vision Servs.*, 2006 WL 2521426, at *4 n.38 (noting that "the reference to the 'business and affairs' of the corporation [in the controller context] suggests something broader than one corporate act, such as the payment of a dividend").

[225] *Superior Vision Servs.*, 2006 WL 2521426, at *4 (emphasis added).

facts that allow a reasonable inference that "other factors" contributed to his ability "to dominate the corporate decision-making process," particularly with respect to the Acquisition.[226]

Before turning to the "other factors," it is appropriate to dilate for a moment on Defendants' position that Musk's relatively "small block" causes the controller analysis to break clearly in their favor. There is no question that the 28% delta between Musk's ownership stake and a voting majority is quite wide. Even so, it is perhaps conceivable that, of all people, Musk might be the minority blockholder who could rally other stockholders to bridge that gap, particularly if one accepts Plaintiffs' allegation that the public investments in Tesla actually reflect investments in Musk and his vision for Tesla's future.[227] With that said, I agree with Defendants that this dynamic alone, even if true, would not be enough to carry Plaintiffs' controller argument across the "reasonably conceivable" threshold.

But there is more. Plaintiffs allege that Musk has demonstrated a willingness to facilitate the ouster of senior management when displeased, as evidenced by the fact that he "forced founder and then-CEO Eberhard out of the Company [and

---

[226] *PNB Hldgs.*, 2006 WL 2403999, at *10; *Superior Vision Servs.*, 2006 WL 2521426, at *4.

[227] *See* Compl. ¶¶ 270–272.

thereafter] appointed himself CEO."[228]  This history conceivably was not lost on members of the Tesla Board when they considered Musk's proposal that Tesla acquire SolarCity.  Plaintiffs also point out that:

> Tesla's bylaws contain several supermajority voting requirements.  For example, any changes at Tesla, including certain mergers, acquisitions, or changes to the Board's compensation or bylaws concerning the Board's composition must be approved by 66 2/3 percent of total voting power of outstanding Tesla voting securities.  This supermajority standard allows Elon Musk significant control over corporate matters while only owning approximately 22% of Tesla's common stock.[229]

All tallied, the facts pled regarding Musk's ability to exercise the equivalent of majority voting control extend beyond mere conclusory statements that he could control the vote.[230]  Nevertheless, I need not decide whether these allegations alone are enough to survive Defendants' dismissal motion because there is more alleged in the Complaint relevant to the controller analysis.

---

[228] Compl. ¶ 61.

[229] Compl. ¶ 22.  Defendants argue that Plaintiffs fail to explain how this requirement supports their claim that Musk is a controlling stockholder.  Defs.' Opening Br.  21 n.8. Here again, I disagree.  Plaintiffs clearly recite the supermajority voting requirement as evidence of Musk's ability to utilize his 22% stake as a blocking position on significant matters that may well directly affect members of the Tesla Board.

[230] *See In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *6 (Del. Ch. Feb. 12, 1990) (observing that plaintiffs must do more to plead that a minority stockholder is a controller than simply say he is a controller).

## 2. Musk's Control Over Tesla's Board

That Musk is the "face of Tesla" cannot meaningfully be disputed.[231] This fact alone, however, is not dispositive of the controller question. Indeed, just recently, in *Dell*, our Supreme Court relied on this Court's post-trial fact findings to conclude that a management buyout of Dell, Inc. led by Dell's founder and CEO, Michael Dell, was not a controlling stockholder transaction.[232] In reaching that conclusion, however, this Court emphasized that after Mr. Dell announced his intent to pursue the MBO: (1) he immediately advised Dell's board he "did not want to proceed further without approval of the Board, and that he would not engage a financial advisor without first informing the Board"[233]; (2) the board formed an independent committee to negotiate with Mr. Dell and Mr. Dell did not participate in any of the board level discussions regarding a sale of the company[234]; (3) the committee actively explored alternatives to Mr. Dell's MBO proposal and Mr. Dell committed to work with any competing bidders[235]; (4) Mr. Dell agreed to "to join up

---

[231] Compl. ¶ 271 ("Elon Musk is the clear public face of Tesla and he is viewed, both within the Company and by much of the public, as a visionary business leader who is, to a significant degree, personally responsible for Tesla's success.").

[232] 177 A.3d at 25.

[233] *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *2 (Del. Ch. May 31, 2016), *aff'd in pertinent part sub nom.*, *Dell*, 177 A.3d 1 (Del. 2017).

[234] *Id.* at *2–3.

[235] *Id.* at *5, 13–14.

46

with whoever" in the event a superior proposal emerged[236]; (5) when the negotiations reached an impasse over price, Mr. Dell agreed to roll over his shares at a lower price than the deal price to resolve the stalemate[237]; and (6) importantly, Mr. Dell entered into a voting agreement that required him and his affiliates to vote their shares "in the same proportion as the number of [s]hares voted by the [u]naffiliated [s]tockholders . . . that are voted in favor of the adoption" of either (i) the MBO merger agreement or (ii) a superior proposal.[238] These facts, and perhaps others, allowed the trial court to determine that, at least with respect to the transaction at issue, Mr. Dell did not "dominate the corporate decision-making process."[239] They also provided a basis for the court to resist the instinctive appeal of the "face of the company" argument when engaging in the controlling stockholder analysis.

According to the well-pled facts in the Complaint, there were practically no steps taken to separate Musk from the Board's consideration of the Acquisition. He

---

[236] *Id.* at *8.

[237] *Id.* at *11.

[238] *Id.* at *12.

[239] *Superior Vision Servs.*, 2006 WL 2521426, at *4. *See also Appraisal of Dell*, 2016 WL 3186538, at *28 ("In this case, the Company's process easily would sail through if reviewed under enhanced scrutiny."); *Dell*, 177 A.3d at 25 (finding "the record shows that . . . this was not a buyout led by a controlling stockholder").

brought the proposal to the Board not once, not twice, but three times.[240]   He then led the Board's discussions regarding the Acquisition throughout its laser focus on SolarCity and was responsible for engaging the Board's advisors. [241]   According to the Complaint, the Board never considered forming a committee of disinterested, independent directors to consider the *bona fides* of the Acquisition.  It took that role upon itself, notwithstanding the obvious conflicts of its members (discussed below). Under these circumstances, it is appropriate to consider whether Musk brought with him into the boardroom the kind of influence that would support a reasonable inference that he dominated the Board's decision-making with regard to the Acquisition.[242]

When Musk rather insistently brought the proposed acquisition to the Board for consideration, the Board was well aware of Musk's singularly important role in

---

[240] Compl. ¶ 85 (citing TESLA00001346); Compl. ¶ 90 (citing TESLA00001348–49); Compl. ¶ 91 (citing TESLA00001455–56).

[241] Compl. ¶¶ 85–86, 90, 92–94, 99–100.

[242] This Court recently determined that a 33.5% blockholder was not a controller in connection with an alleged squeeze-out merger after finding that the pled facts acknowledged the alleged controller did not dominate the management of the target, did not participate in or interfere with board discussions of the acquisition proposal, and did not interfere with the independent committee's search for alternatives (with the advice of independent legal and financial advisors).  *See Rouse*, 2018 WL 1226015, at *4–5, 7. Simply stated, *Rouse* is easily distinguishable because the alleged controller was not involved in the management of the target company, much less its day-to-day management, and the Rouse board took meaningful steps to insulate itself from the alleged controller during its consideration of the proposed transaction.

sustaining Tesla in hard times and providing the vision for the Company's success.[243]

"As Tesla has acknowledged, '[i]n addition to serving as the CEO since October 2008, Mr. Musk has contributed significantly and actively to us since our earliest days in April 2004 by recruiting executives and engineers, contributing to the Tesla Roadster's engineering and design, raising capital for us and bringing investors to us, and raising public awareness of the Company.'"[244] When Tesla was on the ropes, Musk infused his own capital into the Company to keep it afloat.[245] His "Master Plans," parts one and "deux," apparently the products of his mind alone, provide the architecture by which the Company has been and will be operated, right down to the acquisition of a solar energy company.[246] Thus, setting aside Musk's and the Company's public acknowledgments of Musk's substantial influence (discussed below), and the obvious conflicts at the Board level (also discussed below), the pled

---

[243] I acknowledge Defendants' argument that Musk should not be deemed a controlling stockholder with concomitant fiduciary duties simply because he is a hands-on CEO with a clear vision for the Company and its future. Defs.' Opening Br. 17. If that is all Plaintiffs alleged, then their pleading of Musk's controller status would certainly be deficient. But, as discussed here, there is much more to this Complaint's pleading of control than conclusory allegations that Musk is an effective and dynamic CEO.

[244] Compl. ¶ 271.

[245] Compl. ¶¶ 61, 67, 269.

[246] Compl. ¶¶ 138, 140, 270.

facts reveal many of the markers that have been important to our courts when determining whether a minority blockholder is a controlling stockholder.[247]

### 3. The Board Level Conflicts

The question of whether a board is comprised of independent or disinterested directors is relevant to the controlling stockholder inquiry because the answer, in turn, will inform the court's determination of whether the board was free of the controller's influence such that it could exercise independent judgment in its decision-making.[248] Even an independent, disinterested director can be dominated in his decision-making by a controlling stockholder.[249] A director is even less likely to offer principled resistance when the matter under consideration will benefit him or a controller to whom he is beholden.[250]

---

[247] *See Calesa*, 2016 WL 770251, at *11 (finding alleged controller brought the challenged transaction to a board comprised of members that were either not independent of the alleged controller or interested in the transaction); *Zhongpin*, 2014 WL 6735457, at *8 (finding alleged controller was an active CEO and company visionary who was conflicted in the proposed transaction); *Cysive*, 836 A.2d at 553 (finding alleged controller was the founder of the company and was a long-time, active CEO who brought the conflicted transaction to the company).

[248] *See KKR Fin.*, 101 A.3d at 995 ("Here, there are no well-pled facts from which it is reasonable to infer that KKR could prevent the KFN board from freely exercising its independent judgment in considering the proposed merger . . .").

[249] *Kahn*, 638 A.2d at 1116–17.

[250] *Cf. Morton's Rest. Gp.*, 74 A.3d at 665 n.47 (Del. 1984) ("There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.") (citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984)).

In this case, the Board did not form a special committee to consider the transaction, and it is reasonably conceivable that a majority of the five Board members who voted to approve the Offer and Acquisition (Musk and Gracias recused themselves) were interested in the Acquisition or not independent of Musk.[251] Tesla's SEC filings concede Buss and Kimbal are not independent directors.[252] Jurvetson has served on Tesla's Board for nearly a decade.[253] The Complaint's well-pled facts allow a reasonable inference that he and Musk are acquainted beyond mere membership on the Board, as evidenced by Musk gifting to Jurvetson the first Tesla Model S and the second Tesla Model X ever made.[254] DFJ, Jurvetson's venture capital firm, has invested in Tesla three times between 2006 and 2008, and held Tesla stock as recently as late 2014.[255] DFJ also owned

---

[251] *See* Compl. ¶¶ 250–67, 276. Having found the Complaint supports a reasonable inference that three out of the five Board members who voted in favor of the Acquisition are not independent, I need not address the independence of Ehrenpreis and Denholm in this analysis.

[252] Compl. ¶¶ 28, 53; Moritz Aff., Ex. 13, at TESLA00001483. Both were also likely interested in the Acquisition given their close affiliations with SolarCity. *See* Compl. ¶¶ 27–29, 54–55.

[253] Compl. ¶ 47.

[254] Compl. ¶ 48 n.6.

[255] Compl. ¶ 48.

approximately 3.3% of SolarCity's outstanding common stock.[256]  And Jurvetson

himself owned 417,450 shares of SolarCity common stock as of the Acquisition.[257]

Jurvetson also has substantial connections with the third entity in Musk's

"pyramid," SpaceX.  He serves as a member of the board of directors of SpaceX.[258]

And between 2009 and 2015, DFJ participated in four early venture funding rounds

for SpaceX and remains a "significant stockholder."[259]

Musk, in turn, is a frequent investing partner with DFJ principals, including

Jurvetson and DFJ co-founder, Tim Draper, and is invested in DFJ itself.[260]

"Although the actual extent of these relationships is not altogether clear at this point

in the litigation, the existence of these interests and relationships is enough" to allow

a reasonable inference that Jurvetson is beholden to Musk and may not have acted

independently in voting to approve the Acquisition.[261]

---

[256] Compl. ¶ 49.

[257] *Id.*

[258] Compl. ¶ 50.

[259] Compl. ¶ 50 & n.10.

[260] Compl. ¶¶ 48–52.

[261] *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001) (denying motion to dismiss for failure to make a demand and explaining the complaint "pleads with particularity facts that give this Court some reason to believe that a majority of [the company's] current Board is not disinterested or independent" because "[t]he facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities

In addition to the Board level conflicts, Plaintiffs urge me to consider the well-pled facts regarding the "bail-out" of SolarCity that Musk was able to accomplish at Tesla's expense as further evidence supporting a reasonable inference of his control over the Board. Based on Tesla's stock price at the time of the Acquisition, the Company paid approximately $2.6 billion in Tesla stock to acquire SolarCity, a severely distressed company on the brink of bankruptcy but for the Acquisition.[262] According to Plaintiffs, "[s]uch a price is 'so one-sided' that no fiduciary 'acting in good faith pursuant to [Tesla's] interests could have approved the terms,'" further revealing that the Board was dominated by Musk when voting to approve the Acquisition.[263]

---

involved"). Moreover, DFJ's and Jurvetson's significant SolarCity stock holdings suggest that Jurvetson was interested in the Acquisition as well.

[262] Compl. ¶¶ 4–7. As noted, Evercore warned the Tesla Board that SolarCity had $3.164 billion in outstanding debt as of March 31, 2016, and that significant debt would mature in a three-to-five year window. Compl. ¶ 129. *See also* Compl. ¶¶ 121–24, 129–37 (detailing additional troubling facts about SolarCity uncovered during due diligence). Indeed, following the Acquisition, Tesla's debt load nearly doubled. Compl. ¶ 153. And yet, according to Plaintiffs, the Board charged forward, approving the Acquisition within a month of its May 31, 2016 meeting where the Board first authorized Musk and his management team to put in motion certain steps for considering a potential acquisition. Compl. ¶¶ 91, 93–94, 102.

[263] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. 3–4 (citing *In re Ezcorp Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *31 (Del. Ch. Jan. 25, 2016) (internal citations omitted). Plaintiffs also point to the ever-fluctuating DCF analyses, SolarCity's substantial liability exposure in intellectual property litigation and the difficulties confronting SolarCity at its Buffalo Factory as further evidence that the Board's singular focus on SolarCity can only be explained by Musk's dominating influence.

### 4. Musk and Tesla Acknowledge Musk's Influence

In *Zhongpin*, the company's public filings disclosed that it "rel[ies] substantially on [Zhu], and our Executive Vice President [Ben], to manage our operations. . . . The loss of any one of [our key personnel], in particular Mr. Zhu or Mr. Ben, would have a material adverse effect on our business and operations."[264] Additionally, the company's public filings acknowledged:

> Our largest shareholder has significant influence over our management and affairs and could exercise this influence against your best interests. At March 11, 2013, Mr. Xianfu Zhu, our founder, Chairman and Chief Executive Officer and our largest shareholder, beneficially owned approximately 17.3% of our outstanding shares of common stock, and other executive officers and directors collectively beneficially owned an additional 4.2% of our outstanding stock. As a result, pursuant to our By-laws and applicable laws and regulations, **our controlling shareholder** [Zhu] and our other executive officers and directors are able to exercise significant influence over our company . . .[265]

Relying principally upon *Zhongpin*, Plaintiffs argue that Tesla and Musk himself have made similar concessions of Musk's powerful influence over the Company and its Board. As for the Company, its public filings disclose:

- In addition to serving as the CEO since October 2008, Mr. Musk has contributed significantly and actively to us since our earliest days in April 2004 by recruiting executives and engineers, contributing to the Tesla Roadster's engineering and design, raising capital for us

---

[264] *Zhongpin*, 2014 WL 6735457, at *8.

[265] *Id.* (emphasis added).

and bringing investors to us, and raising public awareness of the Company.[266]

- Mr. Musk spends significant time with Tesla and is highly active in [Tesla's] management.[267]

- [Tesla is] highly dependent on the services of Elon Musk, [who is] highly active in [the Company's] management, [and if Tesla were to lose his services, it could] disrupt our operations, delay the development and introduction of our vehicles and services, and negatively impact our business, prospects and operating results as well as cause our stock price to decline.[268]

- The concentration of ownership among [Tesla's] existing executive officers, directors and their affiliates may prevent new investors from influencing significant corporate decisions, [such that] these stockholders will be able to exercise a significant level of control over all matters requiring stockholder approval, including the election of directors, amendment of our certificate of incorporation and approval of significant corporate transactions.[269]

Musk himself has publically stated that: (1) Tesla, SolarCity and SpaceX form a "pyramid" on top of which he sits, and that it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid . . . falters"[270]; and (2) Tesla is "his company."[271]

---

[266] Compl. ¶ 271.

[267] Compl. ¶ 21.

[268] Compl. ¶ 274.

[269] Compl. ¶ 275.

[270] Compl. ¶ 5.

[271] Compl. ¶ 116.

Unlike *Zhongpin*, neither Tesla nor Musk have expressly conceded that Musk is a controlling stockholder.  Indeed, if the public disclosures were all that Plaintiffs could point to as evidence of Musk's control, the pleading likely would come up short.[272]  The public acknowledgements of Musk's substantially outsized influence, however, do bear on the controlling stockholder inquiry when coupled with the other well-pled allegations of Musk's control over the Company and its Board.

* * * * * *

Whether Musk has regularly exercised control over Tesla's Board, or whether he did so only with respect to the Acquisition, is not entirely clear from the Complaint.  For purposes of my decision on the motion, however, that distinction does not matter.  At the very least, the Complaint pleads sufficient facts to support a reasonable inference that Musk exercised his influence as a controlling stockholder with respect to the Acquisition.  Specifically, the combination of well-pled facts relating to Musk's voting influence, his domination of the Board during the process leading up to the Acquisition against the backdrop of his extraordinary influence within the Company generally, the Board level conflicts that diminished the Board's resistance to Musk's influence, and the Company's and Musk's own

---

[272] *See Rouse*, 2018 WL 1226015, at *19 (distinguishing *Zhongpin* on the ground that the disclosure by Rouse's board did not concede that the minority blockholder was Rouse's controlling stockholder).

56

acknowledgements of his outsized influence, all told, satisfy Plaintiffs' burden to plead that Musk's status as a Tesla controlling stockholder is reasonably conceivable. The facts developed in discovery may well demonstrate otherwise.[273] But Plaintiffs have secured a right to pursue that discovery by adequately pleading their breach of fiduciary duty claims and the *ab initio* inapplicability of *Corwin*.

## C. The Exculpatory Charter Provision

Tesla's certificate of incorporation contains an exculpation provision as authorized by 8 *Del. C.* § 102(b)(7).[274] Under *Cornerstone*, Plaintiffs "must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to be dismissed from the litigation. That rule applies regardless of the underlying standard of review for the transaction."[275] Defendants have not raised an exculpation argument, except as to the disclosure claim. And that "argument" consists of a passing reference in a footnote in their Opening Brief.[276] Issues not properly briefed

---

[273] *See, e.g.*, *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192 (Del. Ch. May 22, 2000) (determining the controlling stockholder issue at summary judgment); *Cysive*, 836 A.2d at 552 (determining the controlling stockholder issue post-trial).

[274] Moritz Aff., Ex. 19 § 8.1.

[275] 115 A.3d at 1179.

[276] *See* Defs.' Opening Br. 50 n.29.

are deemed waived.[277]  And failure to raise a legal issue in the above-the-line text of a brief generally constitutes waiver of that issue.[278]  Accordingly, I deem the issue of exculpation waived for purposes of this motion and decline to decide whether each director is entitled to exculpation at this time.[279]  Defendants may raise the issue in summary judgment motion practice should the undisputed facts support a finding of exculpation.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.

**IT IS SO ORDERED.**

---

[277] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999); *Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. Mar. 5, 2010) ("The failure to raise a legal issue in an opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission to the court.").

[278] *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993); *Wimbledon Fund LP-Absolute Return Fund Series v. SV Special Situations Fund LP.*, 2011 WL 6820362, at *3 n.15 (Del. Ch. Dec. 22, 2011) (citing *Murphy*, 632 A.2d at 1152).

[279] 115 A.3d 1173.